IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2008

**ROBERT B. CLARK v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County
No. 01-05153     Lee V. Coffee, Judge**

---

**No. W2007-01440-CCA-R3-PC  - Filed July 2, 2008**

---

The Appellant, Robert B. Clark, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief. Following a jury trial, Clark was convicted of second degree murder, a Class A felony, and sentenced to serve twenty-four years, as a violent offender, in the Department of Correction. On appeal, Clark contends that he was denied his Sixth Amendment right to the effective assistance of counsel. Specifically, he contends that trial counsel was ineffective by: (1) failing to investigate and pursue all possible defenses; and (2) failing to seek pre-trial suppression of his statement to the police. After review of the record before us, we find no error and affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

DAVID G. HAYES, SR.J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

R. Andrew Hutchinson (on appeal); Paul Guibao and R. Andrew Hutchinson (at trial), Memphis, Tennessee, for the Appellant, Robert B. Clark.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Carrie Shelton, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Factual Background and Procedural History**

The relevant underlying facts of the Appellant's case, as established on direct appeal to this court, are as follows:

During the early morning hours of July 18, 2000, the [Appellant's] fiancee, Kimberly Palmore, was found severely beaten at the Cleaborne Temple homeless

shelter in Memphis where she and the [Appellant] had been residing. The victim was transported by ambulance to the Regional Medical Center ("The Med") where she subsequently died on July 26, 2000, as a result of the injuries inflicted upon her.

. . . .

Bobby Lee Marshall, the chief administrator at Cleaborne Temple, testified the victim had been living at the Temple's homeless shelter for about a month and that the [Appellant] had arrived at about the same time. During the early morning hours of July 18, 2000, Marshall, along with John Blazer and Keith Burrell, conducted a security check in the chapel where about a dozen homeless men and women were sleeping. When they entered the chapel, the [Appellant], who was nude, jumped up from between some church pews and began apologizing to Marshall, who then heard the victim groan but did not realize she was injured. Believing that the [Appellant] and the victim were having "like an affair, or something," Marshall told the [Appellant] to gather his belongings and leave the facility. As Marshall checked on the victim, the [Appellant] disappeared "in a split second." Marshall found the victim gasping for breath, and he and two others picked up the mattress she was lying on and carried her to the ladies' lounge where it was cooler. . . .

Sheila Saunders testified that she was staying at the Cleaborne Temple shelter on July 18, 2000, and had met the victim there. After being awakened by someone she identified as "Country," Saunders went to the ladies' lounge where she saw the victim lying on a mattress:

Her shirt was pulled up over her head. Her bra was pulled up here. Her [breast] was showing. Her pants and shorts were at the bottom of her ankles. And blood coming out of the side of her mouth. I notice[d] she had a hold [sic] on the side of her head.

An ambulance arrived, and Saunders accompanied the victim to The Med.

The [Appellant], wearing a torn T-shirt, came to The Med and asked Saunders where the victim was. Saunders told the [Appellant] that he was in trouble because he had "raped [the victim], . . . beat her up and choked her," to which he replied:

Hey, I didn't do all that, man, I didn't rape my own lady . . . . I was between the benches fucking and she called out Keith's name and I slapped her and she got loud at me and I slapped her again and she got louder and I put my hand around her and I choked her.

-2-

. . . The two . . . went outside to talk where the [Appellant] pulled a gun from underneath his shirt and said, "Keith and John, man, was fucking my old lady, man, I'm going to kick Dr. Marshall's ass. . . . I got this . . . for that little nigger fuckin' my gal." . . .

Dr. Cynthia Gardner, an assistant medical examiner for Shelby County, testified that she performed the autopsy on the victim on July 26, 2000. The victim's cause of death was "complications of blunt trauma. The complication was that she developed adult respiratory distress syndrome and it was [a] complication of blunt trauma to both the head and the neck." Dr. Gardner also found a hemorrhage in the deep tissues of the victim's neck which was consistent with strangulation. . . . All of the victim's autopsy findings "occurred as a result of the blunt trauma to the head and to the neck." Dr. Gardner opined that the deep hemorrhaging was caused by a substantial force to the head and could have been produced by a "very forceful blow with a closed fist." . . .

Sergeant James L. Fitzpatrick of the Memphis Police Department Homicide Bureau testified that he investigated the victim's death and interviewed the [Appellant] on July 28, 2000, after advising him of his *Miranda* rights. The [Appellant] signed a waiver of rights form after indicating that he understood his rights and then gave a statement which was reduced to writing and signed and initialed by the [Appellant]. Sergeant Fitzpatrick was then permitted to read aloud the [Appellant's] statement. The [Appellant] said he had known the victim for almost two years, and they were to be married on August 29, 2000. The [Appellant] admitted he and the victim had an altercation in the chapel on July 18, 2000, because "they were 'pimpin' her." . . .

. . . .

The [Appellant], testifying as the sole defense witness, said that he and the victim had lived together for about a year and a half before coming to Memphis from Blytheville, Arkansas, in February 2000 and were engaged to be married on August 29, 2000. . . .

As to what occurred on July 18, 2000, the [Appellant] testified that he went to where the victim was sleeping in the chapel to "comfort her." The victim told him that Bobby Marshall and John Brasley had raped her. Hearing this, the [Appellant] became upset and asked the victim for details. When the victim hesitated to respond, the [Appellant] "hit her, two or three, maybe four times. But, only on the right side of her jaw." He next took his belt and "wrapped it around her neck, just a couple of seconds." The victim then began telling him what had been happening to her at the shelter. After hearing a noise, the [Appellant], who was nude, told the victim to remain where she was and then got up to walk around. He encountered Dr. Marshall

-3-

and had a brief conversation with him. The [Appellant] returned to where the victim was, got his "short pants," and told the victim he would be right back. He then went upstairs, packed his bags, and left the shelter. He went "[d]own the street to an open field," put his bag behind a bush, and waited for about an hour before returning to the shelter and waiting for the victim for about thirty minutes.

*State v. Robert Clark*, No. W2003-00940-CCA-R3-CD (Tenn. Crim. App. at Jackson, June 18, 2003), *perm. app. denied*, (Tenn. Oct. 27, 2003). On December 14, 2001, following a trial by jury, the Appellant was convicted of second degree murder, a Class A felony, and sentenced to twenty-four years in the Department of Correction, to be served at 100 percent as a violent offender. *Id*. After his conviction, the Appellant appealed to this court, challenging the sufficiency of the evidence and a jury instruction regarding the definitions of the mental states pertaining to second degree murder. *Id*. Following review, a panel of this court affirmed the conviction. *Id*.

On October 1, 2004, the Appellant filed a *pro se* petition for post-conviction relief alleging, among other grounds, that he was denied the effective assistance of counsel in violation of his Sixth Amendment right. Following the appointment of counsel, an amended petition for post-conviction relief was filed on June 24, 2005. A hearing was held on May 11, 2007, at which only the Appellant and trial counsel testified. The Appellant testified that trial counsel had failed to adequately meet with him, had failed to properly prepare an available defense, and had failed to challenge the admission of his statement to police. According to the Appellant, trial counsel only met with him in jail on two occasions and only briefly spoke with the Appellant at his court appearances. The Appellant further testified that he informed trial counsel that his statement to the police was false and was obtained by coercion. He related that, although he informed trial counsel that his statement was coerced, no suppression motion was filed prior to trial. He acknowledged, however, that a motion was filed and a suppression hearing was held following the State's proof, with the motion being denied. Moreover, the Appellant gave very confusing and often conflicting testimony concerning his decision to testify at trial. According to the Appellant, trial counsel failed to properly investigate and present evidence in support of a possible theory of defense, that being an intervening cause of death. Specifically, he asserted that Bobby Marshall or someone at Cleaborne Temple could have inflicted further injury on the victim after the Appellant left the Temple or that substandard care by medical professionals at The Med had actually caused the victim's death. The Appellant alleged that trial counsel had failed to find witnesses who were at Cleaborne Temple who could have possibly seen something after the Appellant's departure from the scene. He did, however, acknowledge that trial counsel had obtained the services of an investigator to locate potential defense witnesses. He further faulted trial counsel for failing to introduce evidence regarding charges which were pending at the time against Bobby Marshall for an alleged rape, especially in light of Marshall's inconsistent statements regarding the location where the victim was found. Finally, the Appellant asserted that trial counsel should have spoken with an independent medical expert regarding the possibility of an intervening cause of death, rather than relying upon his discussion with the county medical examiner.

In contradiction to the Appellant's testimony, trial counsel stated that he met with the Appellant numerous times and discussed the facts of the case with him at length. Trial counsel

testified that it was undisputed that the Appellant had confessed to striking and strangling the victim. However, the Appellant insisted that he had not caused the victim's death. The Appellant informed trial counsel that it was possible someone else, possibly Bobby Marshall, at Cleaborne Temple had assaulted the victim a second time after the Appellant left or that her death had resulted from the negligent treatment of the attending physicians at The Med. In response, trial counsel stated that he had an investigator go to Cleaborne Temple in search of possible witnesses. The investigator also checked utility records and other leads provided by the Appellant, but the investigator was unsuccessful in locating any potential witnesses. Moreover, trial counsel stated that he subpoenaed the victim's medical records from The Med and reviewed those records with Dr. Gardner, who performed the autopsy on the victim. Based upon the medical examiner's statements, trial counsel did not believe it necessary to conduct any further investigation into the cause of death of the victim or to retain an independent expert. Trial counsel further stated that the Appellant's assertions with regard to Bobby Marshall were nebulous at best and that Marshall had refused to speak with the investigator. Regardless, trial counsel stated that Marshall had no prior convictions which could be used for impeachment purposes and that any pending allegations of misconduct at Cleaborne Temple were not relevant in the Appellant's trial. Finally, with regard to the Appellant's statement to the police, trial counsel testified that the Appellant failed to inform him that the statement was coerced until immediately prior to trial. Moreover, although a motion to suppress was heard during the trial proceeding, trial counsel stated that it was beneficial to allow the Appellant's statement into evidence, as it contained certain statements which aided the Appellant's defense. Finally, trial counsel testified that he tried to follow every lead and to investigate all possible defenses, although he eventually defended upon the ground that the crime was, at best, manslaughter, based upon the Appellant's statement that the two had engaged in a heated argument prior to the homicide.

At the conclusion of the hearing, the Appellant's petition for post-conviction relief was denied. This timely appeal followed.

**Analysis**

On appeal, the Appellant argues that the post-conviction court erred in finding that he was not denied his Sixth Amendment right to the effective assistance of counsel. To succeed on a challenge of ineffective assistance of counsel, the Appellant bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The Appellant must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), a petitioner must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Id.* at 461. "[A] trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). However, *conclusions of law*, are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id.*

On appeal, the Appellant argues that the evidence presented at the post-conviction hearing preponderates against the court's finding that trial counsel's performance was not below the standard set forth in *Baxter v. Rose* with regard to the investigation of the case and possible theories of defense. Specifically, the Appellant "maintains his contention that there was an intervening cause of death," which should have been investigated. He asserts that "the intervening cause of death was either actions taken by Bobby Marshall or medical malpractice." According to the Appellant, if "these theories [had] been proper[l]y investigated and fully litigated at trial [t]he results of the trial may very well have been different." Additionally, the Appellant contends that trial counsel was ineffective by failing to file a motion to suppress the Appellant's statement to police until well after the trial was underway. He contends that this error "affecte[ed] the very foundation of [the Appellant's] trial strategy[,] [and] [t]he decision on whether to testify on his . . . own behalf."

In its written order denying post-conviction relief, the court found, in relevant part, as follows:

> The [Appellant's] complaint that counsel erred by failing to meet adequately with [the Appellant] prior to trial and failed to adequately interview the [Appellant] regarding possible defenses is unfounded. . . .
>
> . . . This Court resolves issues of credibility against the [Appellant] and accredits the testimony of trial counsel. . . . This [Appellant] is not worthy of belief.
>
> The [Appellant] does not specify what other defenses counsel should have pursued. The [Appellant] testified that he wanted trial counsel to "seek the truth and that someone might have come up with the truth". The [Appellant] essentially wanted trial counsel to prove that "it's a possibility that someone else did this". Trial counsel testified that the [Appellant] rejected all offers and insisted that the [Appellant] did not kill anyone. Trial counsel testified that the only defense was

Voluntary Manslaughter as the [Appellant] claimed that the victim had angered the [Appellant] during sex by allegedly admitting to having sexual relations with other men. The [Appellant's] theory was either someone else killed the victim at Cleaborne Temple or that medical treatment was inadequate. Trial counsel pursued all angles but correctly concluded that the [Appellant's] theories were mere speculation.

[With regard to the motion to suppress, it] was not heard before trial as the [Appellant] never complained about an involuntary statement to trial counsel. Trial counsel testified that the [Appellant] raised an involuntary statement shortly before trial. Trial counsel saw no reason to file any additional motions as trial counsel "did not want to tip his hand to the state". The trial court heard and denied the [Appellant's] motion to suppress. The [Appellant] admitted at his evidentiary hearing that he lied to the trial court during sentencing and during the suppression hearing. The [Appellant] also lied in his evidentiary hearing. The [Appellant] testified under oath that he decided not to testify at trial after the trial court denied his motion to suppress. The trial record shows clearly that the [Appellant] lied again as the [Appellant] did in fact testify at trial.

. . . .

. . . [With regard to possible defenses, trial counsel] testified that the [Appellant's] statements were "nebulous" and that the "[Appellant] was sending us on fishing expeditions and we went fishing". The [Appellant] wanted trial counsel to "go out and see what you could find". As testified [to] at the evidentiary hearing, trial counsel and his investigator did the best that they could.

. . . .

[With regard to trial counsel's decision not to seek independent review of the victim's medical records,] [t]rial counsel testified that he did not see a particularized need to ask for an expert witness to review the findings of the Medical Examiner's Office. The [Appellant's] theory of defense was wholly speculative; someone else could have beaten the victim after the [Appellant] was evicted from the Temple or that the victim received negligent medical treatment. Trial Counsel testified that he reviewed the medical records with Dr. Cynthia Gardner and that she was very helpful. Trial counsel testified further that he believes that the Assistant Medical Examiner is an independent and objective medical expert whose findings were not all one sided. Trial counsel insisted that there were no medical factors that indicated that the victim received negligent medical care. . . .

Further, [the Appellant] had admitted that he struck and choked the victim. Pneumonia and liver infection contributed to the cause of death of this victim and

were related to the injuries that the [Appellant] admitted committing against the victim. Dr. Gardner saw nothing in the victim's medical records that would have indicated that the victim received inadequate medical treatment. The [Appellant] has failed to produce at his evidentiary hearing any medical proof that contradicts the findings and testimony of Dr. Gardner. Therefore, this issue is also without merit.

Following review, we find nothing in the record which preponderates against the post-conviction court's extensive findings. Clearly, the court accredited the testimony of trial counsel and wholly discounted the testimony of the Appellant, whom he found to be untruthful on multiple occasions. As conceded by the Appellant, issues of credibility of witnesses and the weight to be given their testimony are to be resolved by the trier of fact. *See Henley*, 960 S.W.2d at 579. It is not the province of this court to reweigh such determinations.

When a petitioner in a post-conviction proceeding alleges that trial counsel was deficient in failing to pursue a motion to suppress or perform in a specific manner, it is the petitioner's burden to establish by clear and convincing evidence (1) the motion to suppress would have been granted and that the petitioner's allegation of deficient performance has merit; and (2) that had trial counsel performed as suggested, there is a reasonable likelihood the result would have been different. Clearly, counsel cannot be considered ineffective for failing to pursue a motion that is without merit. In this case, the Appellant has failed in both respects with regard to his required burden of proof.

## CONCLUSION

Based upon the foregoing, the Shelby County Criminal Court's denial of post-conviction relief is affirmed.

_____
DAVID G. HAYES, SENIOR JUDGE